UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
CHINESE AUTOMOBILE DISTRIBUTORS OF
AMERICA LLC,

        Plaintiff,        **OPINION AND ORDER**

  - against -        07 civ. 4113 (LLS)

MALCOLM BRICKLIN, JONATHAN BRICKLIN,
BARBARA BRICKLIN JONAS, MICHAEL JONAS,
SANIA TEYMENY, SCOTT GILDEA, and
VISIONARY VEHICLES LLC,

        Defendants.
- - - - - - - - - - - - - - - - - -X

Defendant Malcolm Bricklin is the founder, chief executive officer, and board chairman of defendant Visionary Vehicles LLC. Plaintiff Chinese Automobile Distributors of America LLC ("CADA") complains that Bricklin's false and misleading representations duped it into making a second $2,000,000 investment in Visionary, which is now apparently moribund. Count Three of the complaint—the sole federal claim in this action—asserts that in connection with that second investment Bricklin and Visionary committed securities fraud in violation of Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j) and Securities and Exchange Commission Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

Defendant Scott Gildea (by his own motion) and the remaining defendants (by a collective motion) move to

- 1 -

dismiss Count Three pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, and pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") (15 U.S.C. § 78u-4(b)) and Fed. R. Civ. P. 9(b) for failure to plead securities fraud with sufficient particularity. Defendants argue that dismissal of Count Three is required because (among other claimed deficiencies) the complaint fails to allege facts showing that Bricklin's alleged representations were fraudulent, and does not plead "loss causation" as required for a securities fraud claim under Section 10(b) and Rule 10b-5.

BACKGROUND

The facts set forth below are drawn from the allegations of the complaint and are presumed to be true for the purposes of deciding the motions.

Bricklin planned to make Visionary the exclusive North American distributor of luxury vehicles manufactured in China by Chery Automobile Company, thereby positioning it to sell Chery cars "at a substantial discount off of the price of existing European and Asian luxury models." Compl. ¶¶ 13-15, 20(c). In December 2004, Visionary and

Chery entered into a letter of intent to form a joint venture whereby Chery would build automobiles according to Visionary's specifications, which Visionary would then import and distribute to dealers in the United States. Id. ¶¶ 14-15. "Visionary said it planned to create a dealer network of 250 dealers who would sell" the imported Chery cars. Id. ¶ 15. In exchange for an initial investment of $2,000,000, automobile dealers could become part of the network, receive shares or "units" in Visionary, and obtain the exclusive right to sell the imported cars in specified territories. Id. ¶¶ 15-16.

"The Visionary Vehicles/Chery joint venture appeared to be an attractive investment opportunity" (id. ¶ 17), so CADA invested $2,000,000 in Visionary in October 2005 in exchange for about 800,000 units in Visionary and several sales territories. Id. ¶ 18. In February and March 2006, CADA invested an additional $2,000,000 in exchange for more Visionary units and additional territories. Id. ¶ 21. Bricklin (acting on behalf of Visionary) induced the additional investment by fraudulent representations that:

> a. The relationship between Malcolm Bricklin and Chery was very strong. Chery credited Malcolm Bricklin, Visionary Vehicles, and the publicity surrounding the joint venture, for much of Chery's success and growth in 2005. Chery preferred to deal with Malcolm Bricklin rather than any other automobile manufacturer and,

therefore, Chery would extend the time required to fund the joint venture beyond the original deadline by which funding had to be obtained.

b. Visionary Vehicles was successfully selling the Territories and had commitments of $50,000,000 (fifty million dollars). However, Visionary Vehicles needed an additional $2,000,000 (two million dollars) to survive until the joint venture with Chery was formed and approved.

c. Visionary Vehicles required additional funding to make payroll. If Visionary Vehicles was unable to meet its payroll demands, Visionary Vehicles would lose important personnel who would be instrumental in obtaining the exclusive distribution agreement with Chery.

d. Visionary Vehicles was in danger of filing for bankruptcy. If Visionary Vehicles did file for bankruptcy, Plaintiff could lose its First Investment.

Id. ¶¶ 20(a)-(d).

Those representations are claimed to false because, among other things:

a. Visionary Vehicles raised far less than $50 million in commitments from investors; and

b. Visionary Vehicles was in financial difficulty not because of the necessity of keeping important personnel on the payroll, but because Visionary Vehicles was being systematically looted by Malcolm Bricklin and the other Defendants.

Id. ¶¶ 22(a)-(b).

In April 2006, the "financier George Soros committed $200 million in escrow to enable Visionary Vehicles to finance the joint venture, subject to due diligence." Id.

¶ 19. In the summer of 2006, "Bricklin rejected the financing arrangement with Mr. Soros because of Bricklin's unwillingness to give Soros a majority interest in the venture." Id. ¶ 23. "Although another potential source of funding was located, on or about November 23, 2006, Mr. Bricklin and Visionary Vehicles announced that the joint venture with Chery was canceled, again, upon information and belief, because Mr. Bricklin was unwilling to give control of the venture to the financing party." Id. ¶ 24.

The 'systematic looting' is described as the withdrawal of $250,000 in cash, $130,000 in promotional materials and gifts, and $800,000 without sufficient documentation (id. ¶¶ 26(a), second (c), (d)); payments of $4.9 million to entities related to Malcolm, and of fees up to $130,000 a month to entities related to Jonathan and Barbara Bricklin (id. ¶¶ 26(b), (c)(1)-(2)); placement of Malcolm's companion on the Visionary payroll with no duties (id. ¶ 26(c)(3)); and use of company accounts to pay for medical expenses of $206,000, and to purchase a bicycle for $3,990 (id. ¶¶ 26(e)-(f)). These total $6,289,990 plus the unspecified total of the monthly and payroll fees.

CADA's additional $2,000,000 investment in Visionary "is now worthless." Id. ¶ 27.

DISCUSSION

The motions to dismiss Count Three of the complaint are granted, with leave to replead.

1.

The complaint pleads no facts showing that the alleged representations identified in paragraphs 20(a) and 20(d) of the complaint—which concern the strength of Bricklin's relationship with Chery and the possibility that Visionary might file for bankruptcy—were false or misleading when stated. Accordingly, Count Three of the complaint must be dismissed to the extent that it asserts securities fraud claims based on those alleged representations.

2.

The alleged representations set forth in paragraphs 20(b) and 20(c) of the complaint are properly pleaded to be fraudulent, and to have caused the second investment. The complaint alleges that Bricklin represented to CADA's principals that he "had commitments of $50,000,000" (Compl. ¶ 20(b)) when he had in fact "raised far less than $50

million in commitments from investors" (id. ¶ 22(a)). The complaint also alleges that Bricklin represented to CADA's principals that "Visionary Vehicles required additional funding to make payroll" (id. ¶ 22(c)) without disclosing that "Visionary Vehicles was in financial difficulty not because of the necessity of keeping important personnel on the payroll, but because Visionary Vehicles was being systematically looted by Malcolm Bricklin and the other Defendants" (id. ¶ 22(b)). Those allegations assert material misrepresentations by Bricklin, and (if reasonable reliance[1] upon them by CADA is proved at trial) satisfy the requirement of "transaction causation."

3.

But the complaint does not plead facts showing that the behavior concealed by the inducements caused Visionary's demise and the loss on CADA's now worthless second $2,000,000 investment (the requirement of "loss causation"). On the contrary, the complaint says that Bricklin and Visionary announced the cancellation of the joint venture "because Mr. Bricklin was unwilling to give

---

[1] The complaint shows that a substantial number of the items CADA characterizes as 'looting' are apparent from the "general ledgers of Visionary Vehicles" or from journal entries "made to the books of Visionary Vehicles" (Compl. ¶¶ 26(a), (d)).

control of the venture to the financing party" (id. ¶ 24), and rejected Mr. Soros's $200 million (id. ¶ 23), as well as another potential source of funding, for the same reason (id. ¶ 24). Nor, without further explanation, could it plausibly be asserted that that the 'looting' of less than $10 million or the failure to realize on illusory 'commitments' of $50 million were the proximate cause of the dissolution of the business, while its management rejected the tender of an available $200 million. See Leykin v. AT & T Corp., 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006), aff'd, 216 Fed. Appx. 14 (2d Cir. 2007), cert. denied, 128 S.Ct. 883 (2008)(dismissing securities fraud claims where complaint "does not allege facts showing that it was the claimed concealment which caused plaintiffs' losses, rather than the market-wide Internet stock collapse, nor any way to separate the effect of the misstatements (if there was any) from the general collapse or other causes."); In re Initial Public Offering Securities Litigation, 241 F. Supp. 2d 281, 375 n.136 (S.D.N.Y. 2003)(securities fraud complaint dismissal appropriate when "a plaintiff pleads decisive supervening causes for its loss and thus pleads itself out of court.").

All private plaintiffs asserting securities fraud claims under Section 10(b) and Rule 10b-5 must adequately

allege and "prove that the defendant's fraud caused an economic loss." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 338, 341-42, 346-47 (2005)("Our holding about plaintiffs' need to *prove* proximate causation and economic loss leads us also to conclude that the plaintiffs' complaint here failed adequately to *allege* these requirements." (italics in original)); accord, ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106-07 (2d Cir. 2007). The common law "loss causation" requirement was codified in the PSLRA, which states: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

There are two components to pleading causation in a complaint asserting securities fraud claims under Section 10(b) and Rule 10b-5: "a plaintiff must allege both transaction causation, *i.e.,* that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.,* that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Suez Equity Investors,

L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001)(italics in original).

Plaintiffs must show that the defendants' fraud caused their losses because the securities statutes make private securities fraud actions available, "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." Dura, 544 U.S. at 345; cf. Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir. 2001) ("The loss causation requirement is intended to 'fix a legal limit on a person's responsibility, even for wrongful acts.'" (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994)).

Because there is no effective pleading that the allegedly fraudulent representations concerning the 'looting' or the 'commitments' from investors caused the downfall of the joint venture and the loss on the investment, the securities fraud claims based on those representations must be dismissed.

For the forgoing reasons, Count Three of the complaint is dismissed, with leave to replead.

\* \* \*

The Court having dismissed the complaint's only federal claim well in advance of trial, and the parties not being of diverse citizenship, the Court declines to exercise supplemental jurisdiction over those state law claims in Counts One through Two and Four through Six. Pursuant to 28 U.S.C. § 1367(c)(3), "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if * * * the district court has dismissed all claims over which it has original jurisdiction." See Marcus v. AT & T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

Accordingly, the state law claims are dismissed without prejudice.

## CONCLUSION

Defendants' motions to dismiss Count Three of the complaint (Docket Nos. 16 and 21) are granted, with leave to replead. Declining to exercise supplemental jurisdiction over the remaining state law claims, they are dismissed without prejudice.

The Clerk will enter an order dismissing the complaint

with costs and disbursements according to law.

So Ordered.

Dated: New York, New York
May 8, 2008

                                                  */s/ Louis L. Stanton*
                                                LOUIS L. STANTON
                                                  U. S. D. J.